**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000446
06-FEB-2020
07:51 AM**

NO. CAAP-19-0000446


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


LO, Plaintiff-Appellee,
v.
NO, Defendant-Appellant


APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-D NO. 16-1-1111)


MEMORANDUM OPINION
(By:  Ginoza, Chief Judge, Chan and Hiraoka, JJ.)

Defendant-Appellant NO (**Wife** or **Mother**) appeals from the "Decree Granting Absolute Divorce and Awarding Child Custody" (**Divorce Decree**) entered by the Family Court of the First Circuit[1] on May 20, 2019.  Wife contends[2] that the family court erred in (1) awarding sole physical custody of a minor child to Plaintiff-Appellee LO (**Husband** or **Father**), (2) enforcing a premarital agreement, (3) failing to include a provision about Husband's unpaid child support obligations in the Divorce Decree, and (4) failing to admit Wife's trial exhibit M into evidence. For the reasons explained below, we affirm the Divorce Decree.


**I.**

Wife and Husband were married on August 13, 2014, after signing a premarital agreement.  Their child (**Child**) was born in 2015; Husband has three children from a prior marriage.  Husband

---

[1]     The Honorable Kevin T. Morikone presided.

[2]     Wife's opening brief lists ten points of error; we consolidate and summarize them to facilitate our analysis of Wife's appeal.

filed a complaint for divorce on August 25, 2016. The parties stipulated to have Reneau Kennedy, Ed.D. appointed as a child custody evaluator. Dr. Kennedy filed a report on July 27, 2018. The family court conducted a trial on January 14, 15, and 29, 2019, and on February 4, 2019. Wife, Husband, Dr. Kennedy, and six other witnesses testified at the trial. The Divorce Decree was entered on May 20, 2019. The family court entered a decision and order on April 15, 2019, and findings of fact and conclusions of law on August 19, 2019.

## II.

> [T]he family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006) (citation omitted).

The family court's findings of fact are reviewed under the "clearly erroneous" standard. Fisher, 111 Hawai'i at 46, 137 P.3d at 360. A finding of fact is clearly erroneous when the record lacks substantial evidence to support the finding or, despite substantial evidence in support of the finding, we are nonetheless left with a definite and firm conviction that a mistake has been made. Id. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Id. "It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact." Id. (citation omitted).

The family court's conclusions of law are ordinarily reviewed de novo, under the right/wrong standard, "and are freely reviewable for their correctness." Fisher, 111 Hawai'i at 46, 137 P.3d at 360. However, when a conclusion of law presents mixed questions of fact and law, we review it under the "clearly erroneous" standard because the court's conclusions are dependent

on the facts and circumstances of each individual case. Estate
of Klink ex rel. Klink v. State, 113 Hawaiʻi 332, 351, 152 P.3d
504, 523 (2007). A conclusion of law that is supported by the
trial court's findings of fact and reflects an application of the
correct rule of law will not be overturned. Id.

## III.

Wife challenges 24 of the family court's findings of
fact. We have thoroughly reviewed the record, including all
trial transcripts and exhibits. Conflicting evidence was
presented at trial. The family court's decision and order was
based upon the court's consideration of "the testimony and
demeanor of the witnesses," among other things. The family
court's findings of fact were specifically based upon its
evaluation of "the credibility of the testimony and evidence[.]"
Evaluating the credibility of witnesses and weighing conflicting
evidence "is the province of the trier of fact." Fisher, 111
Hawaiʻi at 46, 137 P.3d at 360. None of the challenged findings
of fact are clearly erroneous; each is supported by substantial
evidence in the record, and we are not left with a definite or
firm conviction that the family court made a mistake.

**A.     The family court did not abuse its discretion by
awarding Husband sole physical custody of Child.**

The family court concluded:

> 33.    Based on the credible and reliable evidence
> presented, as well as the relevant factors enumerated in HRS
> 571-46(b), the Court finds that it is in the best interest
> of the child that Father be awarded primary physical custody
> of the child, subject to Mother's visitation rights outlined
> below.

The paramount concern in child custody cases is the best
interests of the child. W.N. v. S.M., 143 Hawaiʻi 128, 135, 424
P.3d 483, 490 (2018). The criteria and procedures for
determining the best interests of the child in custody cases are
set forth in Hawaii Revised Statutes (**HRS**) § 571-46 (2018),
titled "Criteria and procedure in awarding custody and
visitation; best interest of the child." The portions of that
statute relevant to this case are:

3

(a)    In actions for divorce . . . where there is at issue a dispute as to the custody of a minor child, the court . . . may make an order for the custody of the minor child as may seem necessary or proper.  In awarding the custody, the court shall be guided by the following standards, considerations, and procedures:

  (1)    Custody should be awarded to either parent or to both parents according to the best interests of the child, and the court also may consider frequent, continuing, and meaningful contact of each parent with the child unless the court finds that a parent is unable to act in the best interest of the child;

  . . . .

  (4)    Whenever good cause appears therefor, the court may require an investigation and report concerning the care, welfare, and custody of any minor child of the parties.  When so directed by the court, investigators or professional personnel attached to or assisting the court, hereinafter referred to as child custody evaluators, shall make investigations and reports that shall be made available to all interested parties and counsel before hearing, and the reports may be received in evidence[.]

  . . . .

(b)    In determining what constitutes the best interest of the child under this section, the court shall consider, but not be limited to, the following:

  . . . .

  (2)    Any history of neglect or emotional abuse of a child by a parent;

  (3)    The overall quality of the parent-child relationship;

  (4)    The history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation;

  . . . .

  (6)    The physical health needs of the child;

  (7)    The emotional needs of the child;

  (8)    The safety needs of the child;

  (9)    The educational needs of the child;

  (10)   The child's need for relationships with siblings; [3]

---

[3]    Although Child has no full siblings, Husband has three children from a prior marriage.  Dr. Kennedy reported:

It is apparent that [Child] perceives his half-brothers as his brothers and he calls [one half-brother]'s girlfriend [a
(continued...)

. . . .

> (12) Each parent's actions demonstrating that they
> separate the child's needs from the parent's
> needs; [and]

. . . .

> (15) The areas and levels of conflict present within
> the family[.]

(Footnote added.) The family court made the following findings of fact:

> 39. On or about October 16, 2017, the Honorable Dyan M. Medeiros ordered that Reneau Kennedy, Ed.D. serve a[s] custody evaluator in this case.

> 40. Dr. Kennedy engaged in a comprehensive investigation and provided a 112-page report which was filed on July 27, 2018[,] and received into evidence as Plaintiff's Exhibit "6".

> 41. Dr. Kennedy also provided testimony and was subject to cross-examination during the trial.

> 42. Dr. Kennedy provided her findings and recommendations in her report and also testified to the same.

> 43. The Court found Dr. Kennedy's report and testimony credible and persuasive. Notwithstanding however, approximately six (6) months elapsed between the filing of the report and the completion of trial.

> 44. Dr. Kennedy identified that the child had developmental delays in several areas and that the Department of Health Services provided support and services to the child which helped to compensate for said delays.

> 45. Father took a pro-active approach with respect to the child's education and Mother did not.

> 46. After some time however, it appears that Mother became more supportive of the child's educational needs.

> 47. Although initially, Mother frequently took the child to school late or failed to take the child to school, it appeared to the Court that Mother addressed this issue.

> 48. Although domestic violence between the parties were alleged by both sides, Dr. Kennedy through her extensive investigation, believed that Father's accounts were [sic] more credible and the Court agreed with the same.

> 49. There was no credible evidence that either party was a danger to the child or neglected the child.

---

[3] (...continued)
nickname.] He addresses [Husband's ex-wife] as "Auntie [first name]." . . . [Child] was clearly comfortable with all family members. He would spontaneously engage with all parties.

> 50. It appeared to the Court that both parties had a strong and healthy relationship with the child.
>
> 51. Based on the credible and reliable evidence adduced at trial, the Court found that it is in the child's best interests that Mother and Father share <u>joint legal</u> custody except for educational decisions.
>
> 52. Based on the credible and reliable evidence adduced at trial, the Court found that it is in the best interests of the child that Father be awarded sole physical custody of the child subject to the liberal visitation set forth in the Decision and Order.

The family court's conclusion of law no. 33 is supported by the family court's findings of fact and reflects an application of the correct rule of law. <u>Estate of Klink</u>, 113 Hawaiʻi at 351, 152 P.3d at 523. The family court did not abuse its discretion by awarding Husband sole physical custody of Child.

**B. The family court did not err by enforcing the premarital agreement.**

The parties' premarital agreement included a provision releasing both parties from any alimony or support obligations. Hawaiʻi has adopted the Uniform Premarital Agreement Act, HRS Chapter 572D. HRS § 572D-6 (2018), titled "Enforcement," provides:

> (a) A premarital agreement is enforceable and shall be binding in any action unless the party against whom enforcement is sought proves that:
>
> (1) That party did not execute the agreement voluntarily; or
>
> (2) The agreement was unconscionable when it was executed and, before execution of the agreement, that party:
>
> (A) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
>
> (B) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
>
> (C) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

(b)    If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid eligibility for public assistance.

(c)    An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.

A Hawaiʻi Supreme Court decision concerning a postmarital agreement informs our decision about the premarital agreement at issue in this case:

> The family court must enforce all valid and enforceable postmarital and separation agreements.  A postmarital or separation agreement is enforceable if the agreement is <u>not unconscionable</u> and has been <u>voluntarily</u> entered into by the parties with the knowledge of the financial situation of the other spouse. . . .
>
> Unconscionability encompasses two principles: one-sidedness and unfair surprise.  One-sidedness (i.e., substantive unconscionability) means that the agreement leaves a post-divorce economic situation that is unjustly disproportionate.  Unfair surprise (i.e., procedural unconscionability) means that one party did not have full and adequate knowledge of the other party's financial condition when the marital agreement was executed.  A contract that is merely "inequitable" is not unenforceable. . . .
>
> Generally, a determination of unconscionability . . . requires a showing that the contract was both procedurally and substantively unconscionable when made, but there may be exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone. . . . Under certain circumstances, an impermissibly one-sided agreement may be unconscionable even if there is no unfair surprise.
>
> . . . .
>
> Involuntariness is shown by evidence of duress, coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness. . . .
>
> Duress is defined as a threat of harm made to compel a person to do something against [their] will or judgment; especially, a wrongful threat made by one person to compel a manifestation of seeming assent by another person to a transaction without real volition. . . . An agreement is voidable due to duress when a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative. . . .
>
> . . . .
>
> . . . Coercion is defined as "compulsion of a free agent by physical, moral, or economic force or threat of physical force."  <u>Black's Law Dictionary</u> 315 (10th ed. 2014).  Coercion sufficient to avoid a contract need not . . .

7

consist of physical force or threats of it. Social or economic pressure illegally or immorally applied may be sufficient. . . .

. . . .

. . . Undue influence is "the improper use of power or trust in a way that deprives a person of free will and substitute's another's objective." Black's Law Dictionary 1760 (10th ed. 2014)[.] . . .

Balogh v. Balogh, 134 Hawai'i 29, 40-45, 332 P.3d 631, 642-47 (2014) (cleaned up).

The family court made the following findings of fact:

13.   Prior to their marriage, the parties were introduced to each other by [Wife]'s aunt, who was a friend of [Husband].

14.   At the time the parties were introduced, [Husband] was a United States citizen and domiciled in the State of Hawaii and [Wife] was a citizen of Vietnam and domiciled in Vietnam.

15.   After being introduced, [Husband] and [Wife] communicated with each other by e-mail and text message. Said communications were in the English language.

16.   [Wife] learned English as a second language in elementary school and through high school. Although a second language, [Wife] understood English.

. . . .

18.   Prior to their marriage, [Husband] traveled to Vietnam to visit [Wife]. [Husband] also traveled to Thailand with [Wife].

19.   While the parties were in Thailand, the parties discussed the possibility of marriage and [Husband] raised the issue of a Premarital Agreement ("PMA") and that [Wife] would be required to execute a PMA before the parties would marry.

20.   While [Wife] was still living in Vietnam, the parties became engaged.

21.   [Wife] moved to Hawaii from Vietnam and she entered the United States pursuant to a fiancé visa.

22.   After [Wife] moved, the parties intended to marry within the 90-day deadline [under the fiancé visa]. The parties knew and were aware of the fact that if they did not marry within said time frame, [Wife] would be required to leave the United States.

. . . .

27.   The parties executed the PMA and got married on August 13, 2014.

28.   A few weeks prior to the execution of the PMA, [Husband] provided a copy of the PMA to [Wife] and [Wife]

8

reviewed the same. The parties discussed the content of the PMA and the portions that [Wife] did not like.

29. [Husband] made changes to the initial draft of the PMA to address [Wife]'s concerns.

30. There was no credible or reliable evidence that [Wife] did not voluntarily execute the PMA.

31. Based upon the credible and reliable evidence, [Husband] did not coerce [Wife] to sign the PMA.

32. There was no credible or reliable evidence to support the assertion that [Wife] did not understand the terms of the PMA.

33. There was no credible or reliable evidence that the terms of the PMA was [sic] unconscionable at the time of the execution of the PMA.

34. There was no credible or reliable evidence that the terms of the PMA was [sic] unconscionable at the time of trial.

35. There was no credible or reliable evidence that [Wife] received financial assistance from the State of Hawaii.

36. The PMA was notarized.

37. The PMA (pages 1-9) was [sic] received into evidence as [Husband]'s Exhibit "1".

. . . .

60. Based upon the credible and reliable evidence, orders requiring alimony to be paid to either party were precluded by the PMA.

61. There was no evidence that either party received public assistance from the State of Hawaii or any other governmental agency.

62. Based upon the credible and reliable evidence, Wife did not have a need for alimony.

63. Wife was capable of maintaining regular, full-time employment, but chose not to do so.

64. Wife failed to convince the Court that she complied with her duty to exert reasonable efforts to attain self-sufficiency at the standard of living established during the marriage.

The family court entered the following conclusions of law, which were actually mixed findings of fact and conclusions of law:

4. Chapter 572D of the Hawaii Revised Statutes ("HRS") governs the Premarital Agreement ("PMA") at issue in this case.

9

5.      The PMA satisfied the formalities in that it was in writing and signed by both parties.   HRS § 572D-2.[4]

6.      The terms of the PMA did not violate HRS § 572D-3.[5]

7.      The PMA became effective as of August 13, 2014[,] the date of marriage.   HRS § 572D-4.[6]

---

[4]     HRS § 572D-2 (2018) provides:

A premarital agreement must be in writing and signed by both parties.  It is enforceable without consideration.

[5]     HRS § 572D-3 (2018) provides:

(a)     Parties to a premarital agreement may contract with respect to:

(1)     The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located;

(2)     The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property;

(3)     The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event;

(4)     The modification or elimination of spousal support;

(5)     The making of a will, trust, or other arrangement to carry out the provisions of the agreement;

(6)     The ownership rights in and disposition of the death benefit from a life insurance policy;

(7)     The choice of law governing the construction of the agreement; and

(8)     Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.

(b)     The right of a child to support may not be adversely affected by a premarital agreement.

[6]     HRS § 572D-4 (2018) provides:

A premarital agreement becomes effective upon marriage of the parties to each other.

8. The PMA was never amended or revoked. HRS § 572D-5.[7]

. . . .

10. Based upon the credible and reliable evidence, the Court did not find that [Wife] was forced to execute the PMA. On the contrary, based upon the credible and reliable evidence, the Court found that [Wife] voluntarily executed the PMA.

11. "Unconscionability encompasses two principles: onesidedness and unfair surprise." Balogh v. Balogh, 134 Hawaii 29, 41, 332 P.3d 631, 643 (2014).

12. "As applied to premarital agreements, one-sidedness would mean that the agreement leaves a post-divorce economic situation that is unjustly disproportion-ate. Unfair surprise would mean that one party did not have full and adequate knowledge of the other party's financial condition when the premarital agreement was executed." Lewis v. Lewis, 69 Haw. 497, 502, 748 P.2d 1362, 1366 (1988).

13. Based upon the reliable and credible evidence, the Court found that Husband provided a copy of the PMA to Wife a few weeks prior to the execution of the PMA.

14. In addition, Husband made full disclosure of his premarital assets that he sought to protect via the PMA.

15. There was no credible evidence to controvert the fact that Husband made full disclosure of his premarital assets that he sought to protect via the PMA.

16. Based upon the reliable and credible evidence, the Court found that Wife had adequate knowledge of Husband's premarital assets.

. . . .

18. "[T]he issue of unconscionability of a provision governing division of property in a premarital agreement should be evaluated at the time the agreement was executed." Prell v. Silverstein, 114 Hawaii 286, 297, 162 P.3d 2, 13 (2007)[.]

19. Due to public policy concerns, the determination of whether a spousal support provision is unconscionable is made at the time of divorce. Id.

20. Based upon the credible and reliable evidence, the Court found that neither the terms governing property division, nor the terms eliminating spousal support[,] were unconscionable.[8]

---

[7] HRS § 572D-5 (2018) provides:

After marriage, a premarital agreement may be amended or revoked only by a written agreement signed by the parties. The amended agreement or the revocation is enforceable without consideration.

[8] The issue of whether a premarital agreement is unconscionable is decided by the court as a matter of law. HRS § 572D-6(c).

. . . .

> 49. The enforcement of the PMA precludes an award of alimony to either party.
>
> 50. The PMA did not cause Wife to be eligible for support under a program of public assistance.
>
> 51. There was no credible or reliable evidence that Wife received any assistance under a program for public assistance.

(Footnotes added.) The family court's conclusions of law are supported by the family court's findings of fact and reflect an application of the correct rule of law. Estate of Klink, 113 Hawai'i at 351, 152 P.3d at 523. The family court did not err by enforcing the premarital agreement.

### C. It was not necessary for the Divorce Decree to contain a provision regarding Father's past-due child support payments.

On October 16, 2017, in response to Mother's motion for pre-decree relief, the family court[9] ordered Father to pay $540 per month to Mother as child support. On March 20, 2018, Mother filed another motion for pre-decree relief claiming that Father's child support payments were in arrears.[10] Eight days later, Father filed his own motion for pre-decree relief, contending that he should have been given a child care expense credit. On May 3, 2018, the family court issued a written order directing Father to pay the child support arrearage.[11] A stipulated order that corrected the amount of Father's arrearage to $3,780 (through March 31, 2018) was entered on May 17, 2018.

Mother contends that "[i]t was just plain, reversible error for the Family Court to not reduce Father's child support arrears to Judgment and mention them in this couple's Decree[,]" because "the State of Hawaii [Child Support Enforcement Agency] has somehow adopted some kind of policy that JUST ELIMINATES an

---

[9] The Honorable Dyan M. Medeiros signed the order.

[10] Mother claimed that Father failed to "provide his full social security number so that his wages . . . can be garnished and sent to the [Child Support Enforcement Agency]."

[11] The Honorable Jessi L.K. Hall signed the order.

obligor's child support obligation arrears if they are not mentioned in a Divorce Decree." Mother cites no authority for this proposition, and we find none. In fact, "past-due court-ordered child support payments are enforceable decrees." Lindsey v. Lindsey, 6 Haw. App. 201, 206, 716 P.2d 496, 500 (1986). It was not necessary for the Divorce Decree to contain a provision regarding Father's past-due child support payments.

### D. Wife's contentions regarding Exhibit M lack merit.

Wife contends that the family court erred by declining to admit her "Exhibit M" — an email from Husband to Wife about his alcohol consumption (among other things) — into evidence. Wife attempted to use the document in the second day of trial, during her cross-examination of Husband. Husband objected because the document had not been identified in Wife's trial exhibit list.[12] The family court allowed Wife to use the document for impeachment purposes only, but did not admit the document into evidence. Wife then attempted to use the document to impeach Husband.

On appeal, Wife does not argue that the family court's decision was contrary to any of the Hawaii Rules of Evidence, nor does Wife argue that there were reasonable grounds for her failure to include Exhibit M in her trial exhibit list. Wife's brief uses the Exhibit M issue to re-argue Husband's credibility. Determination of witness credibility is the exclusive domain of the family court, and will not be second-guessed on appeal. See Fisher, 111 Hawai'i at 46, 137 P.3d at 360 ("It is well-settled that an appellate court will not pass upon issues dependent upon

---

[12] Hawai'i Family Court Rules (**HFCR**) Rule 94.3 provides, in relevant part:

> (2)   Each party shall submit to the other party by the exchange date listed in the pre-trial order an Exhibit List and all exhibits which are in [their] possession or under [their] control which [they] intend[] to offer in evidence at the trial.
>
> (3)   Unless so disclosed and exchanged, no exhibits required to be disclosed and exchanged by paragraph (2) shall be received in evidence at the trial over objection unless the court finds that there was reasonable ground for failing to disclose and exchange such exhibits prior to trial.

the credibility of witnesses and the weight of evidence; this is the province of the trier of fact.") (citation omitted).  Wife's contentions regarding Exhibit M lack merit.

## IV.

For the foregoing reasons, we affirm the Decree Granting Absolute Divorce and Awarding Child Custody entered by the Family Court of the First Circuit on May 20, 2019.


DATED:  Honolulu, Hawaiʻi, February 6, 2020.

On the briefs:

Scot Stuart Brower,
for Plaintiff-Appellee.

Michael A. Glenn,
for Defendant-Appellant.

Chief Judge

Associate Judge

Associate Judge

14